**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CURT KELLINGER,<br><br>       Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Civil Action No. 2:10-cv-05154 (SDW)<br><br>**OPINION**<br><br>July 26, 2011 |

**Wigenton, District Judge,**

Before the Court is Plaintiff Curt Kellinger's appeal of the final administrative decision of the Commissioner of the Social Security Administration ("Commissioner"), with respect to Administrative Law Judge Dennis O'Leary's ("ALJ") denial of Kellinger's claim for disability insurance benefits ("DIB") under Sections 216(i) and 223(d) of the Social Security Act (the "Act").

This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons stated herein, this Court AFFIRMS the Commissioner's decision.

**PROCEDURAL AND FACTUAL BACKGROUND**

On August 8, 2007, Kellinger applied for DIB, alleging disability due to post-traumatic stress disorder ("PTSD"), anxiety, depression, and hypertension. (ALJ's Decision at 1.) His claims were denied on March 19, 2008, and again upon reconsideration on June 25, 2008. (*Id.*) Kellinger requested a hearing that was held on

1

October 30, 2009, before the ALJ, who issued a ruling against Kellinger on January 20, 2010. (*Id.* at 1, 12.) Subsequently, the Appeals Council denied Kellinger's request for review. (Compl. ¶¶ 8-9, Oct. 7, 2010.) Thereafter, Kellinger filed this appeal with the Court. (*Id.* at 1.)

A.   **Employment History**

Kellinger was born on March 27, 1959. (Ex. 3E at 1.) He has a high school education and attended the Police Academy and the Emergency Service Academy. (Tr. 6.) From February 20, 1986, to November 11, 2005, Kellinger worked as a police officer for the Port Authority of New York & New Jersey. (Ex. 12E at 1.) He first worked street patrol before becoming an emergency service officer. (Tr. 6.)

In his capacity as an emergency service officer, Kellinger responded to the events of September 11, 2001, at the World Trade Center. (Tr. 12; Ex. 2F at 12.) Upon arriving at the scene, Kellinger witnessed numerous people leap from the burning towers and plummet to their deaths. (Ex. 2F at 12.) One of the most troubling scenes Kellinger witnessed that day occurred when a fireman was struck and killed by a falling body. (*Id.*) Tragically, Kellinger's partner was killed and his best friend was never found. (Tr. 12.) Kellinger reports losing at least twenty friends on that day and attending thirty-seven funerals. (Ex. 2F at 12; Ex. 3F at 132.)

As a result of these events, Kellinger began to develop mental health issues, but continued to work until November 11, 2005, when he was declared unfit for duty and placed on medically restricted leave. (ALJ's Decision at 7; Tr. 12.) While on medically restricted leave—between November 11, 2005, and May 15, 2008—Kellinger collected full pay, but was not required to report to work. (ALJ's Decision at 3.) Kellinger

officially retired on May 15, 2008, when the period for receiving pay for medically restricted leave expired. (ALJ's Decision at 7; Tr. 15.) Kellinger had been previously placed on medically restricted leave a few times, the most notable of which occurred after a seven hour hostage standoff in 1989. (Tr. 7.)

**B.     Medical History**

Kellinger claims he became disabled on November 11, 2005, due to PTSD, anxiety, depression, and hypertension arising from the events of September 11, 2001. (ALJ's Decision at 1; Ex. 4E at 1-2.) At his hearing, Kellinger alleged constant anxiety attacks; severe sleep problems; tension; constant agitation; inability to concentrate or socialize; depression; memory problems; and habitual chewing of his own jaw, neck, and chest. (Tr. 7-10.) In his DIB application, he claimed disability due to PTSD, depression, high blood pressure, and anxiety. (Ex. 4E at 1.)

Work and marital issues further exacerbated Kellinger's symptoms. (Ex. 3F at 144, 148.) Specifically, Kellinger expressed frustration with not receiving a promotion or Medal of Honor for his service on September 11, 2001, and his marital problems, which began thereafter and eventually, caused him and his wife to separate in 2007. (*Id.*; Ex. 4F at 3.)

Kellinger is taking several medications for his numerous medical problems. He is taking Ambien, Lunesta, Seroquel, and Triazapine for sleep. (Tr. 9; Ex. 4E at 6.) He takes Lipitor for high cholesterol; Paxil for depression; Xanax for anxiety; and Prozac. (Ex. 4E at 6.) As a side effect of these medications, he reports feeling drowsy and "in a constant state of headache." (Tr. 11.)

Kellinger has seen several physicians for his mental health issues. The first was

3

Dr. Francis, the Port Authority's psychiatrist, who directed him not to report to work immediately after September 11, 2001. (Tr. 13). As of the date of his ALJ hearing, Kellinger was seeing two mental health professionals regularly: Ms. Susan Kunkel, LCSW and Dr. Louis Arroyo. (Tr. 10.) Ms. Kunkel had been counseling Kellinger since 2001 and Dr. Arroyo had been his psychiatrist since 2004. (*Id.*) Kellinger sees Ms. Kunkel once a week and sees Dr. Arroyo usually about once a month, but sometimes twice a month. (*Id.*)

Ms. Kunkel, in a June 13, 2008 report, stated that Kellinger was suffering from major depression, severe anxiety, and all of the symptoms of "severe" PTSD. (Ex. 9F at 4.) She noted that he suffers from flashbacks related to PTSD, has a poor memory, and has difficulty concentrating. (*Id.*) In a visit on June 11, 2008, she noted that he appeared disheveled and unshaven, and was not oriented to the date or day. (*Id.*) She noted that his intellect was "average to above average" and his judgment was "okay." (*Id.*)

In a September 13, 2008 report, Ms. Kunkel stated that Kellinger has major depression, generalized anxiety disorder, and PTSD, with symptoms including: poor concentration; anxiety with panic and chest pain; fatigue from depression; difficulty focusing; and an easily triggered temper. (Ex. 15F at 3-6.) In an October 19, 2009 report, Ms. Kunkel stated that Kellinger has chronic PTSD, major depression, and generalized anxiety disorder with a GAF of 50 at onset and a GAF of 50-51 at present.[1] (Ex. 17F at 4-5.) She did, however, describe Kellinger's prognosis as good if he avoids moderate to severe stressors. (*Id.* at 5)

Dr. Arroyo, in Reports from April 19, 2006, to July 25, 2007, concurred that

---

[1] A GAF (Global Assessment of Functioning) score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS-DSM-IV-TR 34 (4th Ed. 2000).

4

Kellinger suffers from PTSD with intrusive memories. (Ex. 2F at 12-18.) Dr. Arroyo diagnosed Kellinger with chronic PTSD, mild to moderate recurrent depression, and a GAF of 60.[2] (*Id.* at 14.) A fourth doctor, Dr. Hasson, noted in a March 10, 2008 consultative examination that Kellinger was anxious, tense, and mildly irritable, but could follow questions and do abstract reasoning. (Ex. 4F at 5.) Kellinger's short-term memory and ability to concentrate were within normal limits. (*Id.*) Kellinger was diagnosed with limited symptoms of panic disorder without agoraphobia or anxiety disorder, and a GAF of 50. (*Id.* at 5-6.)

C. **Daily Activities and Residual Functional Capacity**

Kellinger generally begins his day sometime between 4:00 and 6:30 a.m. (Ex. 3F at 158; Ex. 4F at 3.) He tries to go to sleep at about 10 p.m., but is often up until 1 a.m., unable to fall asleep. (Ex. 3F at 158.) When he wakes up, he usually makes something to eat, gets into his car and buys a newspaper, and then walks his dog at 7:00 a.m. (Ex. 4F at 3.) Unable to achieve a full night's sleep, Kellinger goes through the day feeling tired and irritable. (Ex. 3F at 158.)

Kellinger sometimes goes for bike rides in Saddle Brook Park. (Ex. 4F at 3.) He frequently travels to upstate New York to his country home to avoid the stresses of urban life. (Ex. 4F at 4; Ex. 15F at 6.) He enjoys hunting, skiing, motorcycling, and skydiving. (Ex. 4F at 4; Ex. 15F at 6.) Ms. Kunkel stated that Kellinger is able to engage in motorcycling and skydiving—despite the fact that these activities would seem to require a high level of concentration—because he does them reflexively, without thinking. (Ex. 15F at 6.) Kellinger also reported that he is away almost every weekend trying to earn

---

[2] A GAF of 60—while still in the same range as Ms. Kunkel's assessment—indicates less severe mental problems than a GAF of 51. In other words, the higher the GAF, the less severe the condition. *See id.* (explaining GAF scores from 0 to 100).

extra money.  (Ex. 3F at 64.)

Kellinger claims to have no male friends and engages in no social activities.  (Ex. 4F at 4.)  He further claims to be cranky with people, has difficulty getting along with others, has difficulty functioning in crowds, and feels overwhelmed and anxious.  (*Id.*)  Despite these limitations, Kellinger is able to wash and groom himself without help and can clean, cook, and shop for himself.  (*Id.*)  He is able to take public transit, drive, and manage his own financial affairs.  (*Id.*)  If he is stuck in traffic, however, he reports experiencing chest pain.  (Ex. 17F at 2.)

Every doctor concurs that Kellinger is unable to return to work as a police officer.  In a report performed by the Chief Medical Officer of the Port Authority of New York & New Jersey, it was determined that Kellinger is "never fit to perform the full duties of a Police Officer."  (Ex. 3F at 172.)  Ms. Kunkel stated that Kellinger's symptoms "preclude anything related to police work, security, or any job located in or near New York City."  (Ex. 15F at 1.)  Dr. Arroyo rated Kellinger as having poor or no ability to: handle work stresses; maintain attention and concentration; interact with supervisors, co-workers, and the public; behave in an emotionally stable manner; relate predictably; or maintain reliability.  (Ex. 16F at 1-2.)  Dr. Larry Rubin stated that Kellinger is "permanently incapacitated for the performance of the duties required of a police officer."  (Ex. 14F at 1.)

The determinative inquiry, therefore, is whether Kellinger's mental limitations are so severe that there are no other jobs that he can perform.  In order to answer this inquiry, written interrogatories were sent to Mr. Rocco J. Meola, an impartial vocational expert.  (Ex. 14E at 2-5.)  Mr. Meola was asked the following:

6

> Assume a hypothetical individual [of Kellinger's age, education, and work experience] . . . . [T]his individual has the residual functional capacity (RFC) to perform the full range of work at all exertion levels but with the following non-exertional limitations: no interaction with the public and minimal interaction with supervisors and co-workers, only simple and repetitive tasks that do not require stress or undue concentration, no jobs that involving [sic] driving in heavy traffic; and no jobs in New York City. [Could this individual perform his past job or any other jobs in the national economy?]

(*Id.* at 3.)

Mr. Meola replied that this individual could not perform his past relevant work as a police officer because this was skilled or semi-skilled work that involves interaction with the public and being in traffic. (*Id.*) Mr. Meola stated, however, that this individual could work as an electric sealing machine operator (DOT 609.685-154); a garment sorter (DOT 222.687-014); a tabber (DOT 794.687-058); or a bagger (DOT 920.687-018). (*Id* at 4.) Mr. Meola further stated that in the aggregate, there are 1,400 of these jobs in the Northern New Jersey region and about 35,000 of these jobs in the national economy. (*Id.* at 4-5.)

In addition to Mr. Meola, Ms. Kunkel and Dr. Arroyo expressed opinions on Kellinger's work capabilities. In an October 21, 2009 report, Ms. Kunkel stated that Kellinger had a good ability to follow work rules and function independently, but rated his abilities to handle stress and maintain attention and concentration as poor or none. (Ex. 17F at 1.) She stated that Kellinger has a severely impaired ability to focus and remember, lacks the ability to remember appointments, and cannot read the newspaper— an activity he used to enjoy—due to poor concentration. (*Id.* at 1-2.) She further noted that Kellinger's ability to work with others is limited because of high irritability, lack of patience, and anger. (*Id.* at 2.) Ms. Kunkel did, however, rate Kellinger's ability to

7

understand; remember; carry out simple instructions; deal with the public; use judgment; behave in an emotionally stable manner; and relate predictably in social situations as fair. (*Id.* at 1, 3.)

Dr. Arroyo, in reports from May 30, 2008, to October 16, 2009, noted that Kellinger's anxiety can flair with minor stressors, but that medications improve his symptoms and allow at least minor functioning. (Ex. 16F at 3-18.) Several of Dr. Arroyo's reports note that Kellinger's affect and mood were neutral. (*Id.*) Moderate distress was noted on August 26, 2009, but Kellinger reported that a very close friend of his had recently been badly injured. (*Id.* at 6.) Dr. Arroyo noted that Kellinger functions were adequate when not overly strained by events. (*Id.*) On September 14, 2009, general day-to-day functioning was described as stable if stressors are kept in check. (*Id.* at 5.)

In an October 19, 2009 report on Kellinger's ability to do work-related activities, Dr. Arroyo rated Kellinger as having a fair ability to understand, remember, and carry out simple instructions, but as having poor or no ability to handle work stresses; maintain attention and concentration; get along with supervisors, co-workers, and the public; behave in an emotionally stable manner; relate predictably; and demonstrate reliability. (Ex. 16F at 2.)

## **LEGAL STANDARD**

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of

8

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 Fed. Appx. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 Fed. Appx. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because we would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). The court is required to give substantial weight and deference to the ALJ's findings. *Scott v. Astrue*, 297 Fed. Appx. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 Fed. Appx. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**DISCUSSION**

An individual will be considered disabled under the Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy. . . ." § 423(d)(2)(A). Subjective complaints of pain, alone, cannot establish disability. § 423(d)(5)(A). Instead, a claimant must show that the "medical signs and findings" related to his ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Id.*

The Social Security Administration (the "SSA") utilizes a five-step sequential analysis to determine disability. *Cruz*, 244 Fed. Appx. at 480 (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)). "A negative conclusion at steps one, two, four or five precludes a finding of disability." *Id.* However, "[a]n affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Id.* (citing § 404.1520(a)(4)(i)- (v)) (internal quotations omitted).

The Supreme Court describes the evaluation process as follows:

> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990) (citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v). The burden of persuasion lies with the claimant in the first four steps. *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 763 (3d Cir. 2009). Once the claimant is able to show that the impairment prevents him from performing his past work the burden shifts to the Commissioner to demonstrate "that the claimant still retains a residual functional capacity to perform some alternative, substantial, gainful activity present in the national economy." *Id.* (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)).

**Steps One, Two, and Three**

First, the ALJ must determine whether the Plaintiff is, at the time of filing, engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 416.920(a)(4)(i). SGA is work that involves significant physical or mental activities and is done for pay or profit. 20 C.F.R. § 416.972(a)-(b). The ALJ determined that Kellinger has not engaged in SGA since November 11, 2005. (ALJ's Decision at 3.) Neither party disputes this finding nor is it unsupported by substantial evidence.

Under step two, the question is whether claimant has an impairment that significantly affects his ability to work. 20 C.F.R. § 416.920(c). The ALJ found that Kellinger has depression, PTSD, and generalized anxiety disorder, all of which are severe impairments that significantly affect Kellinger's ability to work. (ALJ's Decision at 3.) Neither party disputes this finding nor is it unsupported by substantial evidence.

At step three, the ALJ is required to "compare the claimant's medical evidence to a list of impairments presumed severe enough to preclude any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 376, 379 (3d Cir. 2004). The ALJ determined that Kellinger's mental impairments, considered singly or in combination, did not meet or medically equal the criteria of impairments listed. (ALJ's Decision at 4.) Neither party disputes this finding nor is it unsupported by substantial evidence.

**Step Four**

If there is no substantial evidence to find Plaintiff disabled under one of the listed medical impairments, the ALJ continues the analysis to determine whether Plaintiff can perform his past employment based on his residual functional capacity. 20 C.F.R. § 416.920(e). The residual functional capacity looks at all of the relevant medical and

other evidence in the case record and measures what work, if any, Plaintiff is able to perform based on his mental and physical limitations. *Id.*

First, the ALJ must determine whether Plaintiff is suffering from a medically determinable physical or mental impairment. 20 C.F.R. § 416.920(a)(4)(ii). Second, the ALJ must determine the extent that the impairment limits Plaintiff's ability to work. *Id.* § 416.920(f). Finally, the ALJ must look at Plaintiff's employment prior to his disability claim and determine whether he is able to perform that same past relevant work despite his impairment. *See generally* 20 C.F.R. § 416.920(f).

The ALJ determined that Kellinger is unable to return to work as a New York City Police Officer. This determination was based on findings that Kellinger can have no interaction with the public and only minimal interaction with supervisors and co-workers. (ALJ's Decision at 4.) The ALJ further found that Kellinger is limited to simple and repetitive tasks that do not require stress or concentration, no jobs that involve driving in traffic, and no jobs located in New York City. *Id.* These conditions preclude work as a New York City Police Officer. Therefore, the ALJ's findings at this step, undisputed by the parties, are supported by substantial evidence.

**Step Five**

Finally, if the ALJ determines that Plaintiff cannot perform his past work, then he must inquire as to whether, based on his age, education and work experience, he can perform any other work in the national economy. 20 C.F.R. § 416.920(g). In making this determination, the ALJ must consider whether Plaintiff has exertional and/or nonexertional limitations. *See* 20 C.F.R. § 404.1569(a). A limitation is exertional if it affects Plaintiff's "ability to meet the strength demands of [a job]" such as "sitting,

standing, walking, lifting, carrying, pushing or pulling." *Id*. A limitation is nonexertional if it affects Plaintiff's "ability to meet the demands of [a job] other than the strength demands . . . other than sitting, standing, walking, lifting, carrying, pushing or pulling." *Id.* at § 404.1569(c).

In the present case, the ALJ determined that Kellinger has no exertional limitations. (ALJ's Decision at 9.) This finding, undisputed by the parties, is supported by substantial evidence as the medical records do not note any exertional limitations. Likewise, Kellinger's hobbies, which include skydiving, bike riding, motorcycling, skiing, and hunting, strongly suggest that Kellinger does not suffer from exertional limitations; Kellinger's ability to drive is further evidence of this. (Ex. 4F at 3-4; Ex. 15F at 6.) The dispositive inquiry in the step five analysis, therefore, is whether Kellinger suffers from nonexertional limitations that preclude all types of "heavy" work as defined by 20 C.F.R. § 404.1567(d). The ALJ found that Kellinger does indeed suffer from some nonexertional limitations, but they are not so severe as to preclude all types of heavy work. (ALJ's Decision at 11.)

A.  *The Treating Physician Rule: The Reports of Dr. Arroyo and Ms. Kunkel*

First, Kellinger argues that the ALJ improperly gave Ms. Kunkel and Dr. Arroyo's opinions "lesser weight" at step five without providing a supporting explanation. (ALJ's Decision at 9; Pl.'s Br. 9.) "[Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). Reports of treating physicians should be accorded

14

controlling weight when they are well-supported by medical evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). However, "[a]n ALJ may reject a treating physician's opinion outright . . . on the basis of contradictory medical evidence . . . [and] may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1984)).

> Plaintiff's argument fails because the ALJ did provide an explanation as follows:
>
> Based on the claimant's activities, his ability to function independently, his improvement once he left the Port Authority, as noted in Ms. Kunkel's reports (Exhibit 3F), Dr. Arroyo's April 19, 2006 report noting grossly intact memory and cognition, and consultative examiner Dr. Hasson's March 10, 2008 report noting that the claimaint could follow questions, do abstract reasoning . . . and had normal short-term memory and concentration (Exhibit 4F), I find that Dr. Arroyo's and Ms. Kunkel's opinions deserve lesser weight under 20 CFR 404.1527.

(ALJ's Decision at 9.)

These supporting explanations are sufficient to give the reports of the treating physicians lesser weight and the ALJ's findings are therefore supported by substantial evidence.

In addition, even if the ALJ did not deem it appropriate to give lesser weight to the reports of Dr. Arroyo and Ms. Kunkel, the ALJ could still have found that Kellinger was not permanently disabled: Dr. Arroyo and Ms. Kunkel's reports are consistent with the ALJ's RFC determination. The RFC determination indicated that Kellinger was limited from interacting with the public; could only minimally interact with supervisors and co-workers; was limited to simple and repetitive tasks that do not require undue stress or concentration; was limited to jobs that do not involve heavy traffic; and could

15

not be employed in New York City. (*Id.*) This determination is entirely consistent with the reports of Dr. Arroyo and Ms. Kunkel, each of which is discussed immediately below.

Dr. Arroyo noted that Kellinger's medications allow at least minor functioning. (Ex. 16F at 3-18.) Several of Dr. Arroyo's reports note that Kellinger's affect and mood were neutral. (*Id.*) Dr. Arroyo noted that Kellinger functions adequately when not overly strained by events. (*Id.* at 6.) On September 14, 2009, general day-to-day functioning was described as stable if stressors are kept in check. (*Id.* at 5.) In an October 19, 2009 report on Kellinger's ability to do work-related activities, Dr. Arroyo rated Kellinger as having a fair ability to understand, remember, and carry out simple instructions. (Ex. 16F at 2.)

Similarly, Ms. Kunkel rated that Kellinger had a good ability to follow work rules and function independently. (Ex. 17F at 1.) She further rated Kellinger's ability to understand; remember; carry out simple instructions; deal with the public; use judgment; behave in an emotionally stable manner; and relate predictably in social situations as fair. (*Id.* at 1, 3.) These reports, by both Dr. Arroyo and Ms. Kunkel, are consistent with the ALJ's RFC determination and therefore the decision to give them lesser weight, even if incorrect, was harmless error.

B.      *The ALJ's Evaluation of Nonexertional Limitations*

The Third Circuit has held that subjective complaints of pain must be considered and may support a finding of disability. *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984). However, such complaints, "without more, do not in themselves *constitute* disability." *Id*. An ALJ must weigh testimony as to pain or other symptoms against the objective medical evidence. 42 U.S.C. § 423 (5)(A). "When a claimant complains of

16

pain and establishes the existence of a medical impairment that could reasonably be expected to produce the pain, the ALJ must 'determine the extent to which [the plaintiff] is accurately stating the degree of pain or the extent to which he . . . is disabled by it.'" *Milano v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 166, 170 (3d Cir. 2005) (quoting *Hartranft*, 181 F.3d at 362).

In making the determination, the ALJ may consider: (1) daily activities; (2) "the location, duration, frequency, and intensity of the pain or other symptoms"; (3) precipitating and aggravating factors; (4) the "type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate [the] pain or other symptoms"; (5) "[t]reatment, other than medication . . . receive[d] . . . for relief of [the] pain or other symptoms"; (6) any other measures used to relieve the pain or symptoms; and (7) "[o]ther factors concerning . . . functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(i)-(vii). Although the ALJ has an affirmative duty to consider Plaintiff's subjective complaints, the ALJ may reject the subjective complaints as not credible when they are inconsistent with the objective medical evidence, claimant's own testimony, or other evidence on the record. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

The record before this Court supports the ALJ's determination that Kellinger's subjective complaints are contradicted by evidence in the record and that his allegations of total disability are overstated. First, the ALJ notes that at a March 10, 2008 consultative examination, Dr. Hasson reported that Kellinger could follow questions, do abstract reasoning, and possessed a normal short-term memory and ability to concentrate. (ALJ's Decision at 6; Ex. 4F at 5.) As stated above, Ms. Kunkel stated that Kellinger can

maintain ordinary life skills and drive as well as function independently. In addition, Dr. Arroyo reported favorably regarding Kellinger's day-to-day functioning and ability to do work-related activities. Several reports further note that Kellinger's symptoms had improved since he retired; that he was spending more time with friends; and that he lost weight because he has more time to work out. (ALJ's Decision at 8; Ex. 3F at 70-79.) Kellinger also reported that he was feeling better when away from the area. (ALJ's Decision at 8; Ex. 3F at 70-79.) These factors, considered in their entirety, suggest that Kellinger—although suffering from serious psychological problems—is not permanently disabled and therefore the ALJ's findings are supported by substantial evidence.

## **CONCLUSION**

For the foregoing reasons, the Court holds that substantial evidence supports the ALJ's decision. Accordingly, the Court **affirms** the judgment of the ALJ.

s/ Susan D. Wigenton, U.S.D.J.

Orig:     Clerk
cc:       Parties